CHRISTINE M. PAJAK (STATE BAR NO. 217173), and
cpajak@stutman.com
NEETA MENON (STATE BAR NO. 254736), Members of
nmenon@stutman.com
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone:	(310) 228-5600
Facsimile:	(310) 228-5788

Attorneys for NCB and NCB, FSB

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**RIVERSIDE DIVISION**

| | |
|---|---|
| In re:<br><br>WMI, a California corporation,<br><br>In re:<br><br>WMI I, a California corporation,<br><br>In re:<br><br>WMIRE, a California corporation,<br><br>In re:<br><br>WILLIAMS MECHANICAL, INC., a California corporation,<br><br>Debtors. | Case No. 6:09-16530-TD<br>Case No. 6:09-16536-TD<br>Case No. 6:09-16543-TD<br>Case No. 6:09-16550-TD<br><br>Chapter 11<br><br>**OBJECTION OF NCB AND NCB, FSB TO DEBTORS' EMERGENCY MOTION FOR USE OF CASH COLLATERAL PENDING A FINAL HEARING**<br><br><u>Hearing</u><br><br>Date:	April 8, 2009<br>Time:	1:00 p.m.<br>Place:<br><br><u>Appearance in Person</u><br>Courtroom 1345<br>255 E. Temple St.<br>Los Angeles, CA 90012, <u>or</u><br><br><u>Appearance by Teleconference</u><br>Courtroom 303<br>3420 Twelfth St.<br>Riverside, CA 92501 |

485522v3

National Consumer Cooperative Bank, a federally chartered financial corporation ("NCB"), and NCB, FSB, a federally insured thrift institution ("NCB, FSB" and, together with NCB, the "Bank")[1] by its undersigned counsel, hereby files its objection to the "Debtors' Emergency Motion for Use of Cash Collateral on an Interim Basis Pending a Final Hearing" (the "Motion").[2]

**PRELIMINARY STATEMENT**

Styled simply as a request to use the Bank's cash collateral, the Motion is nothing more than a thinly veiled attempt to hijack the Bank to become the Debtors' unwilling DIP lender. Out of money, the Debtors seek this Court's approval to extract collateral being held by the Bank to fund the operations of WMI I – an entity that the Debtors argue has provided no security to the Bank.[3] Notwithstanding the fact that the Debtors draw into question the Bank's asserted security interests in any assets of WMI I, it is this entity's assets that are the most valuable and are to provide the so-called "adequate protection" to the Bank. Moreover, it is WMI I's business that needs the most funding to support its continued operations. The Debtors cannot have it both ways and should not be allowed to rob from Peter to pay Paul.[4]

Notwithstanding this fallacy in the Debtors' logic, the Debtors have nevertheless failed to meet their burden of proof of demonstrating that the Bank is adequately protected. Relying on the self-serving statements of Debtors' management regarding the value of their existing accounts receivable and backlog of anticipated work – neither of which takes into consideration aged accounts or the ability of the Debtors to perform the contracted work – the Debtors assert, without any evidentiary support, that the Bank is more than adequately protected. In fact, the Debtors ask that this Court find that the <u>listing price</u> set by the Debtors' real estate broker hired to market the Debtors' real property is evidence of the property's *actual value*. Nothing could be more

---

[1] NCB, FSB is a wholly-owned subsidiary of NCB.

[2] Terms not otherwise defined herein shall have the same meanings ascribed to them in the Motion.

[3] The Bank disputes the Debtors' allegations as explained more fully below.

[4] This is exactly what the Debtors are trying to achieve by asking that the Bank give up its interest in the CD's it is currently holding as collateral for the Debtors to fund the operations of WMI I. In exchange, the Debtors offer the Bank nothing more than replacement liens limited to the extent of its prepetition liens against the Debtors' assets. In other words, the Debtors ask that the Bank fund WMI I's operations, which will be "adequately protected" by liens that the Debtors seek to challenge. This is a completely untenable result.

2

485522v3

suspect, especially in this market. Taking into account all of the Debtors' assets and other collateral pledged to the Bank, no collateral cushion exists, and the Bank is not adequately protected.

The Debtors are incapable of proving that the Bank is adequately protected not only because the Debtors have provided no evidence to substantiate the valuation of their own assets but they have also (i) understated the Debtors' outstanding liability to the Bank and (ii) overvalued third-party collateral pledged to the Bank  The Debtors completely ignore approximately $3 million in outstanding letters of credit that have been issued by the Bank to support the Debtors' bond financing on various projects. Furthermore, the Debtors claim that the Bank is holding more than $3.6 million of additional liquid collateral from the former owners of Mechanical, but the actual amount held is just about $2.8 million.

Although the Debtors have failed to contact the Bank to initiate any type of negotiations before filing,[5] the Bank is mindful of the exigencies that exist, especially as they concern ensuring payment of the Debtors' employees. In that regard, the Bank is willing to consent to the Debtors' interim use of cash collateral that is currently available in the Debtors' multiple accounts at the Bank, on the condition that the Bank is granted a valid post-petition lien with respect to all of the Debtors' assets, including those belonging to WMI I. As of April 7, 2009, the money available in the Debtors' accounts, in the aggregate, totals more than $483,000. As reflected in the cash collateral budget attached to the Motion as well as in the Debtors' motion to pay the pre-petition wages of their employees, if the Debtors need these funds to operate the business of WMI I and, therefore, then the Bank must be assured that its rights in this cash collateral are fully protected by full and comprehensive post-petition liens against this Debtor's property. With this consensual use of cash collateral for a limited period of time of no more than one week, the Debtors and Bank will then have the opportunity to engage in more meaningful discussions for a longer term solution.

---

[5] At no time immediately prior to, or after, seeking bankruptcy protection did the Debtors ever contact the Bank or Bank's counsel to discuss the terms of the consensual use of cash collateral. The Bank attempted to engage Debtors' counsel in this type of discussion and suggested parameters for the Debtors' use of cash collateral but the Debtors failed to respond.

3

485522v3

# I.

# BACKGROUND FACTS

Since 2003, the Bank has entered into multiple lending relationships with the Debtors. Its most significant extension of credit was made in connection with the sale of the equity ownership in Mechanical by its former owners to an Employee Stock Ownership Plan ("ESOP"). The Bank extended a loan to Mechanical, secured by substantially all of the assets of Mechanical, to fund this sale in two pieces – once in 2003 and the other in 2005. As of October 2005, Mechanical's outstanding obligation to the Bank under this loan (the "ESOP Loan") was $9,140,000 and, as of today, the balance due is approximately $6 million.

More than half of the original ESOP Loan proceeds, however, were pledged by Mechanical's former owners to secure the timely payment of the ESOP Loan. As Mechanical paid down the outstanding balance on the ESOP Loan, certain of these "held back" amounts were released by the Bank to Mechanical's former owners in accordance with the underlying loan and collateral documents. Currently, the Bank is holding a little more than $2.8 million in pledged liquid assets by Mechanical's former owners.

In addition to this pledged collateral, the Bank also required that Mechanical provide the Bank with $2 million in certificates of deposit ("CDs") to act as cash collateral for the ESOP Loan. Mechanical was entitled to the interest earned on these CDs and, eventually, the amount held in the CDs was reduced to $1.5 million. As of April 7, 2009, the CDs have a value of just under $1.6 million.

Following the extension of credit under the ESOP Loan, the Bank then entered into a mortgage loan with WMIRE (the "WMIRE Loan") to fund the acquisition of real property and the construction of Debtors' facilities. Not only is the WMIRE Loan secured by a first priority deed of trust and assignment of rents, but it is also guaranteed by WMI, the holding company of WMIRE, Mechanical and WMI I. The outstanding balance under the WMIRE Loan is approximately $4.4 million.

Finally, the Bank has also extended further funding to Mechanical through a line of credit. Starting with an initial line of credit of $500,000 in 2003, the parties, through a series of

4

amendments, increased this line of credit to $5,000,000 in 2008. Up to $3.5 million of this line of credit was to be used to support Mechanical's bond financing through the issuance of letters of credit. In fact, Mechanical has not only drawn down $2.675 million on the line of credit, but has also caused the Bank to issue more than $3 million in outstanding letters of credit. Given that the Debtors have now filed for bankruptcy protection, it is more likely than ever that these letters of credit will be drawn down.

To summarize, the outstanding amounts due to the Bank are as follows:

| Loan | Original Amount | Current Balance |
| --- | --- | --- |
| ESOP Loan | $9,140,000.00 | $5,956,676.00 |
| WMIRE Loan | $4,358,800.00 | $4,358,800.00 |
| Line of Credit | $2,700,000.00 | $2,675,000.00 |
| Outstanding Letters of Credit (approximate) | $3,000,000.00 | $3,000,000.00 |
| **Total** | | **$15,990,476.00** |

Thus, the actual amount outstanding to the Bank is almost double the amount that the Debtors allege is due. See Motion at 23-24, lines 20-2 (asserting that the total debt due is $8.7 million). Aside from the relatively de minimis amounts held in the Debtors' bank accounts, the Bank holds just $1.6 million in cash collateral pledged by the Debtors. While this is the only readily quantifiable asset that the Debtors have made available to the Bank to secure its loans, the Debtors seek to force the Bank to turn over a portion of these funds to finance the Debtors' post-petition operations, under the guise that the Bank is adequately protected. Nothing could be further from the truth.

The Debtors baldly assert that they have substantial value in a number of assets that offer adequate protection to the Bank. The Debtors, however, have not provided any admissible evidence to support any of their valuations. Moreover, despite the fact that the overwhelming majority of this claimed value rests with WMI I, the Debtors turn around and question the validity

5

485522v3

of the Bank's pre-petition liens against this entity's property.[6]  Given these assertions by the Debtors, the claims of adequate protection ring hollow.  Accordingly, contrary to what the Debtors would like this Court to believe, the Bank is far from being adequately protected.  As such, the Bank should not be forced to give up its only real protection – the value in the CDs – to finance the post-petition operations of WMI I.

## II.

## ARGUMENT

### A. The Debtors Have Failed to Meet Their Burden To Prove that the Bank is Adequately Protected.

The Debtors seek authority to use the Bank's cash collateral pursuant to Bankruptcy Code section 363(c)(2).  Pursuant to Bankruptcy Code section 363(e), the Debtors can be granted such relief only if they provide the Bank with adequate protection, as defined in Bankruptcy Code section 361.

The operative provisions of Bankruptcy Code section 363 state, in pertinent part, as follows:

> (c)(2)  The trustee may not use . . . cash collateral under paragraph (1) of this subsection unless --
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section.
>
> . . .
>
> (e)  Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, **shall** prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

---

[6] Only after management had extracted the funding that they needed from the Bank did they create a new entity, WMI I, to handle a supposedly new line of business in the commercial marketplace.  Without the financing made possible by the Bank, the Debtors would not have been able to establish WMI I.  The Bank is still investigating the spin off of this entity to determine if it was permitted under the parties' underlying loan and collateral documents.  Nevertheless, the Bank asserts that it is has valid liens against the assets of WMI I as it represents the proceeds of its collateral interests held against the other Debtors in any event.

485522v3

1 | See 11 U.S.C. §363.

The Bank has not consented to the Debtors' use of its cash collateral, because the Debtors have not provided the Bank with any information upon which the Bank could conclude that the value of the Bank's collateral will be preserved despite the obvious reduction resulting from the use of Bank's cash collateral to pay employee wages and general operating expenses, among other expenses. To obtain authority from this Court to use the Bank's cash collateral over the Banks opposition, the Debtors must prove that they are providing the Bank with adequate protection. Under Bankruptcy Code § 361, adequate protection is such protection as is necessary to avoid **any** diminution in the value of the Bank's collateral.

A secured creditor has a constitutional right to have the value of its secured claim preserved. In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984) (stating that a secured creditor's security interests in cash collateral are "property rights" protected by the Fifth Amendment); see also, H.R. Rep. No. 595, 95th Cong. 2nd Sess., 339 (1977), reprinted in U.S.C.C.A.N. 6295. Bankruptcy Code section 363(o)(1) places the evidentiary burden to prove that it is preserving the Bank's collateral squarely on the Debtors' shoulders: "the trustee has the burden of proof on the issue of adequate protection . . . ."

Case law confirms that, pursuant to Section 363(o), the burden of proof on the issue of adequate protection lies firmly with the debtor in possession seeking authority to use collateral. See In re JKJ Chevrolet, Inc., 190 B.R. 542, 546-47 (Bankr. E.D. Va. 1995); In re 5877 Poplar, L.P., 268 B.R. 140, 146 (Bankr. W.D. Tenn. 2001) See In re Keystone Camera Prods. Corp., 126 B.R. 177, 183-84 (Bankr. D.N.J. 1991). The debtor's burden on the issue of adequate protection is a high one. First Bank of Miller v. Wiesler, 45 B.R. 871, 876 (D.S.D. 1985); see also In re Sheehan, 38 B.R. 859, 868 (Bankr. D.S.D. 1984) ("A party proposing to use cash collateral must prove by clear and convincing evidence that an entity claiming an interest in cash collateral will realize the value of its bargain in the light of all the facts and circumstances of the case.") Self-serving testimony and projections that are not supported by credible evidence are insufficient to overcome this evidentiary burden. See In re Glasstream Boats, Inc., 110 B.R. 611, 613 (Bankr. M.D. Ga. 1990) (denying a motion for use of cash collateral where the debtor was unable to

7

provide evidence that the use of cash collateral will not diminish the value of the secured creditor's collateral); In re Kansas Office Assocs., Ltd., 173 B.R. 745, 750 (Bankr. D. Kan. 1994) (granting the secured creditor's motion to prohibit the use of cash collateral where the debtor failed to provide sufficient evidence of adequate protection); In re Carlyle, 242 B.R. 881, 896 (Bankr. E.D. Va. 1999) (finding that the debtor failed to meet its burden of proof on the adequate protection issue where the debtor elected not to offer any evidence at the hearing).

Here, the Debtors have proffered no evidence that would suggest that the Bank would be adequately protected if its cash collateral is used. The most obvious problem with the Motion is that the Debtors are speaking from both sides of their mouth, asserting that if one takes into consideration the assets of *all* of the Debtors, the Bank is adequately protected. In the same breath, the Debtors state that the Bank has no claim against the one debtor holding any real value. The Debtors are gerrymandering the facts in any way that suits them, and are taking totally contrary positions in the process.

Putting aside for a moment the Debtors' waffling, even if all of the Debtors' assets could be regarded as replacement collateral, the Debtors have not provided any evidence that the value of this purported collateral would protect the Bank against the diminution of its cash collateral. In the Motion, the Debtors enumerate seven "primary assets." Two of these assets, the current cash on hand and the certificates of deposits, have a real dollar value. Pursuant to the Motion, these are precisely the two assets that the Debtors seek to use as cash collateral in the Motion, along with hypothetical post-petition earnings. As so-called "adequate protection" for the assured diminution of this "real" cash collateral, the Debtors offer the Bank five other assets, with either unknown or little value, as described in detail below.

First, the Debtors claim to have approximately $9.3 million in outstanding accounts receivable but have offered no evidence supporting their actual value. The Debtors themselves concede that almost $2 million of the amounts due are not payable until project completion and have offered no evidence regarding their collectability. Moreover, with respect to the remaining $7.4 million, the Debtors have presented no evidence to support their valuation. Based on the Debtors' prior submissions to the Bank, there is reason to believe that a substantial portion of these

8

485522v3

accounts receivable are aged (over 90 days old), which raises serious collection risks. Without more evidence, the Debtors have failed to support their burden in demonstrating that the existing accounts receivable would provide adequate protection to the Bank.

Second, the $37.65 million in backlogged work is only an asset to the Debtors if (a) they have an operating business that is capable of completing that work and (b) the Debtors' customers are capable of paying for that work. Based on the Debtors' dire finances and the current state of the real estate market, both of these assumptions are doubtful. The Debtors admit that they are currently trying to scrape together enough money to make payroll – the idea that they will be ready in the near future to take on such a massive backlog of discrete projects is ambitious, to say the least. If the Debtors have made commitments to undertake these projects which they later cannot perform, it is very possible that these same "assets" will later become a liability to the Debtors. Similarly, in the absence of any admissible evidence with respect to the financial viability of the Debtors' customers, there is no legitimate basis for the Court to conclude that any of these alleged contracts (none of which have been admitted into evidence) has any real value whatsoever, especially under current market conditions.

Third, the listing price of their real property as evidence of its value. A property's listing price is not sufficient evidence of a property's value in determining whether a secured creditor is adequately protected. See In re Ocasio, 97 B.R. 825, 826-27 (Bankr. E.D. Pa. 1989) (finding that "[a] listing price is precisely what that term suggests and debtor obviously cannot guarantee that anyone will meet that demand figure or counter with an amount anywhere approaching the initial listing price. As such…debtor has failed to meet her burden of proving adequate protection."). This is especially true in the current real estate market. A real estate appraisal will yield a realizable value significantly less than the Debtors' asserted value of $6.7 million. It is much more likely that the value is much closer to the Bank's outstanding mortgage loan of almost $4.4 million and, therefore, can offer no additional adequate protection for the Debtors' requested use of the Bank's cash collateral.[7]

---

[7] Market conditions have continued to deteriorate since the Bank's last appraisal conducted in 2007 valued this property (if and when completed) at slightly more than $5.8 million.

9

485522v3

<u>Fourth</u>, the Debtors have provided no evidence to support their FF&E valuation nor any basis for how they calculated its depreciation. The availability of these assets are incapable of providing any real value to the Bank.

<u>Finally</u>, the Debtors do not even attempt to place a dollar value on their alleged goodwill and, as such, the Bank has no way of knowing what kind of protection, if any, this collateral might offer it. The Debtors' current financial straits do not offer much comfort that Debtors' goodwill is worth much of anything, especially when the Debtors' ability to operate as a going concern is critically in doubt. Notably, the Debtors have provided no legal authority for the premise that a creditor may be provided adequate protection in the form of a lien on the goodwill of a money-losing contractor during the most significant real estate crisis in generations.

Simply put, the Debtors have failed to meet their burden of proof. The sheer lack of substantiation provided by the Debtors to support their valuations renders it impossible for the Bank, let alone the Court, to determine whether the collateral being provided by the Debtors offers any true protection against the diminution of the Bank's cash collateral. The very nature of some of these "assets" makes it very likely that they currently, or soon will, have no value at all. For example, the Debtors' backlogged projects, which the Debtors claim are worth more than $37 million, could very turn out to be worthless if the Debtors are unable to operate; even if the Debtors were able to <u>perform</u> under these contracts and the Debtors' customers were able to <u>pay</u>, there is simply no evidence that any of these contracts would be <u>profitable</u> so as to generate <u>net gains</u> for the estate, rather than losses. The same is true for the Debtors' purported goodwill.

Therefore, in exchange for the use of the Bank's cash collateral, which has a real, quantifiable value and that offers the only solid security on the Bank's outstanding loans, the Debtors offer the Bank replacement liens in questionable collateral whose value has not been substantiated by the evidence. Essentially, the Debtors are seeking a court order to force the Bank to finance their operations, which is no different from the Bank giving the Debtors yet another loan.[8]

---

[8] The Debtors' own counsel tacitly reveals the Debtors' intention to turn the Bank into an unwilling DIP lender in submitting a declaration in support of the Motion titled "Declaration of Monica Y. Kim, Esq. in Support of Debtors' Emergency Motion for Authority to Use Cash Collateral and **to Obtain Post-Petition Financing on a Secured Basis** on an Interim Basis Pending a Final Hearing." (emphasis added).

485522v3

**B.    The Bank will Consent to Debtors' Use of Funds in Debtors' Bank Account Provided a Full and Valid Post-Petition Lien is Offered in Return.**

Notwithstanding the many defects in the Debtors' Motion to use the Bank's cash collateral, the Bank understands the exigent circumstances facing the Debtors.[9] Furthermore, the Bank is mindful of the immediate need for cash to pay the most important expenses of the Debtors, especially their employees, in order to preserve value and provide the Debtors and the Bank with an opportunity to engage in meaningful discussions regarding matters related to these cases. Therefore, the Bank is willing to consent to the Debtors' interim use of cash collateral that was currently available in the Debtors' multiple accounts at the Bank on April 7, 2009 on the condition that the Debtors grant the Bank a valid super priority 364(d) post-petition lien with respect to all of the Debtors' assets, including those belonging to WMI I. As of April 7, 2009, the balance in these accounts was $483,691, which is substantially more than the $169,596 claimed by the Debtors in the Motion. Because the Debtors need these funds to operate the business of WMI I[10], the Bank must be assured that its rights in this cash collateral are fully protected by full and comprehensive post-petition liens against this Debtor's property. With this consensual use of cash collateral for a limited period of time of no more than one week, the Debtors and Bank will then have the opportunity to engage in more meaningful discussions for a longer term solution.

---

[9]   In fact, as of the end of business on April 7, 2009, the Bank made the first and only attempt to engage in discussions regarding the consensual use of cash collateral by reaching out to Debtors' counsel and suggesting parameters for the Debtors' use of cash collateral. Unfortunately, the Debtors failed to respond.

[10]  For example, pursuant to the Debtors' motion to pay pre-petition wages to their employees, the Debtors seek authority to pay approximately $186,000 in employee wages. Based on their relative number of employees, the Bank estimates that more than $175,000 will be used to pay the employees of WMI I whereas just $11,000 will fund the payroll for Mechanical.

485522v3

**WHEREFORE**, for all the reasons set forth above, the Bank respectfully requests that this Court (1) grant the Debtors' interim use of the Bank's cash collateral limited to the funds available in the Debtors' bank accounts as of April 7, 2009 at the Bank for a period of no more than one week provided that the Bank is also granted a full and valid post-petition security interest in, and lien against, *all* of the Debtors' assets, including those belonging to WMI I; (2) deny the Debtors' request to use any other portion of the Bank's cash collateral; and (3) grant such other and further relief as this Court deems just and equitable under the circumstances.

Dated: April 8, 2009

   /s/ Christine M. Pajak
Christine M. Pajak, and
Neeta Menon, Members of
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION

Attorneys for NCB and NCB, FSB

485522v3

| In re:<br>WMI, a California corporation | CHAPTER 11 |
|---|---|
| Debtors | CASE NUMBER 6:09-16530-TD, et al |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
1901 Avenue of the Stars, 12th Floor, Los Angeles, California 90067

The foregoing document described as **OBJECTION OF NCB AND NCB, FSB TO DEBTORS' EMERGENCY MOTION FOR USE OF CASH COLLATERAL PENDING A FINAL HEARING** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 8, 2009** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

| | |
|---|---|
| Hon. Thomas Donovan | (to be served either by hand delivery or electronic service) |
| Ron Bender | rb@lnbrb.com |
| Christine M Pajak | cpajak@stutman.com |
| Jacqueline L. Rodriguez | jlr@lnbrb.com |
| United States Trustee (RS) | ustpregion16.rs.ecf@usdoj.gov |

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, ~~and/or with an overnight mail service~~ addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 8, 2009 | Denice Gonzalez | /s/ Denice Gonzalez |
|---|---|---|
| | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                                                **F 9013-3.1**
485565v1